[No. G012357. Fourth Dist., Div. Three. Sept. 30, 1993.]

HOWARD M. BIDNA, Plaintiff and Appellant, v.
NANCI ANN ROSEN et al., Defendants and Respondents.

**COUNSEL**

Bidna & Keys, Richard D. Keys, Harvey M. Moore and Jon A. Longerbone for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Randolph B. Godshall, Weinfeld & Mixon, Cameron Jolly, Ezra and Brutzkus and Robert Ezra for Defendants and Respondents.

**OPINION**

**SILLS, P. J.—**

I

The trajectory of the case law now governing malicious prosecution claims arising out of family law proceedings arcs toward one destination: a bright line barring any such claims, no matter how egregious the defendant's conduct in the family law action. The present case (at least as pled) is egregious indeed, and forces us to ponder whether the arc should be completed.

After the trial court awarded primary physical custody of a couple's daughter to the husband, the wife's mother told him that she would use her superior financial resources to keep reopening custody issues until the husband finally "gave up" custody of the child. Over a period of less than a

year the wife (allegedly funded by her mother) brought a series of *six* totally meritless ex parte applications and OSC's (orders to show cause) to change custody.[1] The husband alleges these proceedings ended up costing him in excess of $200,000

The issue before us is not an easy one. If we affirm the judgment, we consign the husband to various family law remedies, which conspicuously do not include punitive damages and damages for emotional distress. Moreover, the Napoleon behind the scheme to wear the husband down under the barrage of family law litigation—his erstwhile mother-in-law—may very well escape liability while his ex-wife is alleged to have effectively rendered herself "judgment proof" from any family law sanction award.

On the other hand, reversal will open the sluice gates to the rivers of bitterness that often typify family law cases. (See *Green* v. *Uccelli* (1989) 207 Cal.App.3d 1112, 1121 [255 Cal.Rptr. 315].) Lawyers are notoriously clever at overstating their cases in their complaints (see *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276 [54 Cal.Rptr. 104, 419 P.2d 168]); a few failed OSC's in the family law courts will no doubt allow able counsel to construct a complaint that will make their case look almost as bad as this one.

Reversal also means enduring the chill on family law remedies created by the possibility of a civil suit for malicious prosecution. It is the nature of family law that in even the most decently managed case there is often the need for multiple OSC's and motions. Allowing malicious prosecution in the wake of unsuccessful motions may discourage meritorious proceedings, including those brought for the best interests of children.

The crux of the matter boils down to the inadequacy of the husband's family law remedies "balanced" against the "floodgate" and "chilling" effects (three hackneyed but efficient legal metaphors) of permitting malicious prosecution actions. As explained below, this balance tilts against malicious prosecution. Our Supreme Court has stated that the "most promising remedy for excessive litigation does not lie in an expansion of malicious prosecution liability" but in "sanctions for frivolous or delaying conduct" the first time around. (*Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 873 [254 Cal.Rptr. 336, 765 P.2d 448].) The remedy for egregious conduct in family law court is for the family law bench to nip it in the bud with appropriate sanctions, not to expand tort liability for malicious prosecution to the family law bar. Taking our cue from *Sheldon Appel*, we complete the arc.

---

[1]Compare *In re Marriage of Green* (1992) 6 Cal.App.4th 584 [7 Cal.Rptr.2d 872] (deliberate attempt to "exhaust" other party emotionally and financially in family law and "related" proceedings justified large attorney fee and cost award under Civ. Code former § 4370).

## II

As this case comes to us upon demurrer, we assume as true the facts (but not the conclusions) set out in the complaint. Here they are:

Howard Bidna (husband) and Nanci Rosen (wife) were married and had one child, Molly, born in 1985. An action to dissolve the marriage was begun in October 1988. After a trial of custody and visitation issues, the court awarded husband physical custody of Molly in a judgment entered in January 1990.

Not quite a month later, in February 1990, wife and her attorneys brought an OSC to modify the custody order so that wife would be awarded physical custody. The OSC was heard and denied in May 1990, with the family law court stating that the "standards" for modification of the custody order had "not been approached."

Meanwhile, in March 1990, wife and her counsel filed an appeal of the custody judgment. The judgment was eventually affirmed.

In June 1990, less than a month after the unsuccessful OSC to change custody, wife and her attorneys applied to the court for an order that Molly be placed in a year-round school with physical custody evenly divided between husband and wife. The court denied the request.

In October 1990, wife and her attorneys applied for an ex parte order modifying the custody award. The application was denied. At the same time they brought an OSC "seeking a material modification" of the award. (The amended complaint does not tell us precisely what kind of modification.) The OSC was heard at the end of the month and was denied.

Less than a month later, on November 27, 1990, wife and her attorneys sought an ex parte order "materially modifying" the custody judgment. It was denied. At the same time they brought an OSC to do the same thing. The OSC was set for hearing in December; it was denied.

Additionally, wife violated the custody agreement by taking Molly to another psychiatrist and not returning her at the end of the 1990 Christmas vacation. And, at some point, wife's mother stated that if wife was not awarded physical custody of Molly, she would use her superior financial resources to appeal or otherwise keep reopening custody issues until husband "gave up" custody of Molly. Husband, himself an attorney, incurred over $200,000 in attorney fees to fend off the various custody proceedings.

In his brief in this appeal, husband also assures us he could amend his complaint to allege the wife's mother made all the "strategic" decisions in wife's futile campaign to change custody. This campaign cost them upwards of half a million dollars or more. Also, wife and her mother have "deliberately conducted their financial affairs so as to make it difficult or impossible to collect any award of sanctions or attorney fees" from wife.[2]

III

The case law reveals an abiding judicial reluctance to entertain malicious prosecution actions which arise either out of motions or OSC's, or originate in family law proceedings. This case falls into both categories.

We begin with *Twyford* v. *Twyford* (1976) 63 Cal.App.3d 916 [134 Cal.Rptr. 145], which held that a wife's requests for admissions in connection with a contempt proceeding for failure to pay amounts due in a dissolution action (the requests essentially accused her husband of forgery) could not support a malicious prosecution action because they did not constitute "a separate proceeding" and had "no independent existence." (63 Cal.App.3d at p. 922.)

Twelve years later *Chauncey* v. *Niems* (1986) 182 Cal.App.3d 967 [227 Cal.Rptr. 718] held that an OSC re contempt and an OSC re modification of child and spousal support awards could not support a malicious prosecution cause of action because the complaint in that case insufficiently alleged the element of prior favorable termination to the plaintiff. (See 182 Cal.App.3d at pp. 977-978.) Along the way, however, the *Chauncey* court suggested that the OSC's might have had, when "[e]valuated realistically," a sufficiently "independent existence" of the underlying dissolution action to be themselves the basis for a malicious prosecution action. Those OSC's required the plaintiff to retain counsel, appear in court, and respond to discovery; they also cost money and provoked expenditures of time and effort. (See 182 Cal.App.3d at pp. 975-976; and see generally 182 Cal.App.3d at pp. 973-978.)

Next came *Lossing* v. *Superior Court* (1989) 207 Cal.App.3d 635 [255 Cal.Rptr. 18]. *Lossing*, unlike *Twyford* and *Chauncey*, did not originate in a family law case. (The basis of the malicious prosecution claim was an OSC for contempt for failing to show up for a deposition in a personal injury

---

[2]We do not take this allegation to mean necessarily, however, that the wife has transferred community assets to her mother. The question of whether the mother may be joined as a "claimant," that is, one who "claims an interest in" the family law proceeding (see Civ. Code, § 4363), is dealt with in a companion appeal, case No. G012682.

case.) However, *Lossing* did give Justice King, coauthor of a leading family law practice guide (Hogoboom & King, Cal. Practice Guide: Family Law 1 (The Rutter Group 1993)) an opportunity to disagree strongly with the "independent existence" dicta in *Chauncey*. (See 207 Cal.App.3d at pp. 637-639.)

The *Lossing* court was frankly appalled at the idea that an OSC re contempt could support a malicious prosecution suit. The court quoted and "fully" agreed with the trial judge's comment that it "will wreak havoc on courts if every time somebody decides they've been maliciously prosecuted in the course of a proceeding, they can file another action, a separate and independent action." (207 Cal.App.3d at pp. 639-649, fn. 4.) As to the case before it, the *Lossing* court held the "institution of a contempt proceeding in an ongoing action" could not serve as the basis for a malicious prosecution claim. (See 207 Cal.App.3d at p. 638.) Proceedings to "sanction discovery abuse" are simply "without sufficient independence to support a cause of action for malicious prosecution." (207 Cal.App.3d at p. 639.)

*Lossing* was quickly followed by *Green v. Uccelli, supra,* 207 Cal.App.3d 1112 (*Uccelli*).[3] *Uccelli*, also authored by Justice King, stemmed from two OSC's from a family law case: one for contempt for failing to pay court-ordered attorney fees, the other for failing to obey a court order to return a garage door opener. The first OSC was supposedly dismissed for "lack of prosecution," which we may take to mean voluntarily withdrawn from the calendar.[4] The second OSC was taken off calendar when the garage door opener was returned.

---

[3]The war between Caroline and James Green prompted not only *Uccelli*, but *In re Marriage of Green* (1989) 213 Cal.App.3d 14 [261 Cal.Rptr. 294] [*Green I*] and *In re Marriage of Green* (1992) 6 Cal.App.4th 584 [7 Cal.Rptr.2d 872] [*Green II*]. (We might have called *Uccelli* "*Green I* " but that would probably be more confusing.) *Green I* was an appeal from the judgment of dissolution raising primarily property division issues, *Green II* was an appeal from an award of attorney fees and costs. In *Green II*, the court held that six different actions and proceedings, including *Uccelli*, were "related" under subdivision (a) of Civil Code section 4370 as it read at the time, and could therefore support an award of attorney fees under the statute.

[4]The defendant in *Uccelli*, the wife's attorney, contended the OSC was taken off calendar when the plaintiff belatedly paid the fees. Reading between the lines, one can imagine that after the fees were paid, the wife and her attorney either did not show up for the hearing or simply told the court that there was no longer any need to prosecute the OSC. Given that the *Uccelli* court considered the difference between "lack of prosecution" and voluntary withdrawal irrelevant (207 Cal.App.3d at p. 1117), it appears the court treated the "lack of prosecution" as the functional equivalent of voluntary withdrawal.

Such treatment, of course, makes sense. Because of their short lead times and the (usual) irrelevance of any statute of limitations, family law OSC's are not like civil complaints which remain viable for years until a defendant notices that too much time has expired without any action on the case and brings a motion for dismissal for lack of prosecution.

The appellate court affirmed the sustaining of the demurrer to the ensuing malicious prosecution action, self-consciously "extending" the scope of the *Lossing* decision to OSC's re contempt that are "taken off calendar before hearing." For a variety of good reasons relating to unique aspects of family law cases (see 207 Cal.App.3d at pp. 1121-1123), such OSC's could not serve as the "basis for a malicious prosecution action."[5]

Most recently, *Silver* v. *Gold* (1989) 211 Cal.App.3d 17, 23-24 [259 Cal.Rptr. 185] held that an unsuccessful motion to disqualify counsel in a civil action had an *in*sufficiently independent existence to justify a malicious prosecution action.

## IV

The cases are thus clearly heading in one direction, though they have not yet reached their destination: an absolute bar of malicious prosecution claims based on *any* kind of family law motion or OSC. This direction is even reflected in Justice King's family law practice guide. A previous edition of the guide stated, "The reasoning of *Lossing* and [*Uccelli*] *probably* applies as well to other 'ancillary' family law OSCs and motions brought in 'bad faith' or for an improper purpose." (See Hogoboom & King, Cal. Practice Guide: Family Law 1 (The Rutter Group 1992) ¶ 1:176, italics added.) The current edition shuts the small crack in the door left open by the word "probably." Under a heading concerned with whether there is liability in malicious prosecution for meritless motions and OSC's (other than those for contempt, which are covered by *Lossing* and *Uccelli*) the guide now states: "The reasoning of *Lossing* and [*Uccelli*], above, applies as well to other 'ancillary' family law OSCs and motions brought in 'bad faith' or for an improper purpose."[6]

Still, the fact remains that the actual language in the cases themselves is not absolute. *Uccelli* quoted with approval a statement in *Chauncey* that explicitly left the door open for "egregious cases." (See *Uccelli, supra*, 207 Cal.App.3d at p. 1122, quoting *Chauncey, supra*, 182 Cal.App.3d at p. 979: "To hear malicious prosecution claims in any but the most egregious cases would unduly encourage litigation of this sort.")

█ Because the egregious case has now come before us, we now weigh the arguments both for and against a bright line rule for family law cases.

---

[5]In *Uccelli*, the plaintiff sued his ex-wife's attorney but not his ex-wife. The court did not see the need to determine whether its analysis would be the same if the ex-wife was involved. (207 Cal.App.3d at p. 1117, fn. 2.) Hence, the court added the words "against the attorney for the moving party" to its statement about off-calendar OSC's not serving as the "basis" for a malicious prosecution action. (See 207 Cal.App.3d at p. 1121.)

[6]See Hogoboom and King, California Practice Guide: Family Law 1 (The Rutter Group 1993) paragraph 1:176.

The arguments for a bright line rule are several and substantial. First, family law cases have a unique propensity for bitterness. In commenting on family law litigation in *Uccelli*, for example, Justice King found himself using "bitter" or "bitterness" four times in just one paragraph. (See 207 Cal.App.3d at p. 1121.) Bitterness and emotional distress often form a kind of background noise in family law litigation, which in turn makes it extremely difficult to distinguish truly "malicious" motions and OSC's from ordinary ones.

Second, family law courts have the unique ability to swiftly discourage litigious nonsense *at its source* by means of attorney fee awards which are intended as a sanction against a party's conduct.[7] Fee awards are common considerations in family law OSC's.

Third, family law remedies require a special sensitivity and flexibility; allowing separate malicious prosecution actions in the wake of unsuccessful attempts to obtain certain remedies may have a chilling effect on the ability to obtain those remedies by, in effect, increasing the risk of asking for them. (See *Lossing, supra*, 207 Cal.App.3d at p. 638 [allowing a malicious prosecution for a failed OSC re contempt "would inject into the choice of sanctions an element unrelated to the appropriateness of the sanction"]; *Chauncey, supra*, 182 Cal.App.3d at p. 979, quoting *In re Marriage of Benson* (1985) 171 Cal.App.3d 907, 913 [217 Cal.Rptr. 589] [emphasizing need for flexibility in family law].) The chill may be particularly bitter in a case such as this one where child custody is involved and one party may think (even if without probable cause) that he or she is acting in a child's best interest.

Finally, albeit perhaps tangentially, there is the impact of separate malicious prosecutions (as distinct from sanctions in the "initial" or underlying case) on lawyers' malpractice insurance premiums generally, a point explicitly made in *Lossing*.[8] Allowing malicious prosecution actions in family law

---

[7]The authority for such awards is currently found in Civil Code section 4370.6. Beginning in 1994 this section will become section 271 of the new Family Code. And of course there is always section 128.5 of the Code of Civil Procedure.

Unless otherwise indicated, all references to section 128.5 are to the Code of Civil Procedure and all references to section 4370.6 are to the Civil Code.

[8]See *Lossing* v. *Superior Court, supra*, 207 Cal.App.3d 635, 641, footnote 5. If the remedy is family law sanctions rather than malicious prosecution, the lawyer usually represents himself or herself, the matter is over and done with relatively quickly, and there is (usually) no reason to bother the malpractice insurer. Like a $50 fender-bender, most sanction motions do not register on an insurer's radar. However, if a separate malicious prosecution action is filed, the lawyer will likely request a defense from his or her malpractice insurer, and the

cases will no doubt do its little bit to make the practice of law and the access of clients to lawyers just that much more expensive.[9]

Against these formidable policy factors stands the arguable inadequacy of internal family law remedies under the facts of cases such as this one, where a nonspousal party uses superior resources to wage a half-million dollar campaign of attrition against one of the litigants. Relegating that litigant to his family law remedies effectively immunizes this nonspousal party. And, as is illustrated in a companion appeal dealing with the husband's attempt to join his former mother-in-law and her attorneys to the family law action (case No. G012682), joinder of such a party is not always possible.[10]

Limiting husband to family law remedies means limiting him to what he can recover under section 128.5 of the Code of Civil Procedure and under section 4370.6 of the Civil Code (soon to be section 271 of the new Family Code). Neither statute allows husband to recover for his emotional distress, obtain punitive damages or tap the supposedly deep pockets of the mother-in-law.

Sanctions under section 128.5 are limited to parties and their attorneys, and to "expenses" incurred by another party.[11] The use of the word "expenses" indicates that emotional distress is not within the statute's ambit. Moreover, punitive damages are not allowed except for certain situations involving felonies.[12]

As to section 4370.6, it also is limited in its reach. An award of attorney fees under the section as a sanction is limited to "property or income of the party against whom the sanction is imposed." (Civ. Code, § 4370.6, subd.

---

costs of defending (and maybe settling) the action will eventually be passed on to the profession as a whole. (Cf. *ibid.*)

[9]Consider an attorney who limits his or her practice to family law from an underwriter's point of view. If there is a bright line, the underwriter can feel reasonably confident that malicious prosecution suits do not present much of a risk to such an attorney, and presumably can adjust malpractice premiums accordingly (i.e., downward).

[10]In the nonpublished companion case, we hold that the family law court acted correctly in deciding to deny the husband's request to join his former mother-in-law to the family law case.

[11]Subdivision (a) of the statute sets out the operative language. It currently reads: "Every trial court may order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay. This section also applies to judicial arbitration proceedings under Chapter 2.5 (commencing with Section 1141.10) of Title 3 of Part 3."

[12]See subdivision (d) of section 128.5. Under the maxim *expressio unius exclusio alterius* (express the one thing, exclude the alternative) punitive damages *qua* punitive damages would not normally be available outside of subdivision (d).

(c).) In a case such as this one, the section has no force against a nonparty to the family law action who is alleged to be the behind-the-scenes mastermind and financier of the malicious proceedings in that action. Further, section 4370.6 provides that no sanction shall impose "an unreasonable financial burden" against a party (Civ. Code, § 4370.6, subd. (a)), which indicates that there are upper limits to the amount of any sanction under the statute.

While we have been invited to construe section 128.5 to include emotional distress, we decline to rewrite the Legislature's handiwork simply to make it easier to show that victims of maliciously prosecuted family law proceedings can be "made whole" (in the tort sense of the phrase) outside of a malicious prosecution action. We accept the limitations inherent in sections 128.5 and 4370.6 the way Oliver Cromwell accepted his face when he told his portrait-ist to paint it, "warts and all." Of course, the inability to recover emotional distress or punitive damages makes family law sanctions a less attractive remedy than a full-blown tort case for malicious prosecution.

Nevertheless, despite the arguable "inadequacy" of family law remedies, we hold that no malicious prosecution action may arise out of unsuccessful family law motions or OSC's. The tie breaker is *Sheldon Appel Co.* v. *Albert & Oliker, supra*, 47 Cal.3d 863, which enunciates a basic judicial policy in favor of curing the evil of abusive litigation at its source rather than allowing it to metastasize into yet more litigation.

*Sheldon Appel* held that a lawsuit filed by sellers of an apartment building seeking to impose an equitable lien on the building (to secure the repayment of certain proceeds the sellers claimed they were owed) was with probable cause, even if not ultimately meritorious, because the lien claim was "legally tenable" and "objectively reasonable." (See 47 Cal.3d at pp. 883, 885 & 886.) Before tackling the "specific questions" presented by the case the Supreme Court reviewed the "policy concerns" posed by the tort of malicious prosecution generally, and concluded that the "better" remedy for "unjustified litigation" is the speedy resolution of that litigation and the "imposition of sanctions for frivolous or delaying conduct within that first action itself." (47 Cal.3d at pp. 872-873.)[13] In view of this policy, "traditional limitations" on malicious prosecution should not be relaxed. (47 Cal.3d at p. 874.)

In reviewing the present case, it is perhaps too easy to forget that no California case has yet extended the tort of malicious prosecution to family

---

[13]The policy reflects, to some degree, the insight that yet more litigation is itself an inefficient means of remedying and deterring abusive litigation. After all, if the choice is between a simple OSC for attorney fees in the aftermath of a meritless motion or a separate action for malicious prosecution with a life of its own and up to five years to come to trial, it is obvious that the former is the more economical of the two.

law actions. As explained earlier in this opinion, the cases which have considered malicious prosecution claims in the aftermath of family law litigation have found *some* reason to reject them; the crack in the door for the "egregious" case is dicta. Seen in this light, the question before us is not whether malicious prosecution should be *precluded* as a remedy for abusive family law proceedings, but whether it should be *extended* into an area of the law where it has not yet gone. Given the disfavored status of the tort (see *Sheldon Appel, supra*, 47 Cal.3d at p. 872) and the preference against its expansion beyond traditional limits (47 Cal.3d at pp. 873-874), the result is compelled.

While family law sanctions may not afford recovery for emotional distress, or allow access to the deep pockets of a friend or relative who may be stirring up meritless family law motions and OSC's, there is no reason family law courts need tolerate the sort of nonsense that the husband alleges transpired here. Family law courts have the power to make attorney fee awards in connection with any discrete proceedings, or entertain separate OSC's for sanctions within a short time thereafter. Under the facts as alleged in this case, for example, we see no valid reason at all why the family law courts could not have awarded sanctions either immediately after each meritless proceeding, or in a separate OSC held shortly thereafter.[14]

In this regard, we strongly emphasize the importance of extending single-judge calendaring to family law courts as soon as resources permit. Despite the introduction of "fast track" systems by trial courts where a case is assigned to one judge for all purposes, it is still not uncommon for several different judges to preside over various stages of family law litigation, or, apropos the instant case, various ex parte applications and OSC's.[15] Thus in some large urban areas, there may be a "time lag" built into the family law court's ability to respond to one party's attempts to wear the other down. It may not be apparent until several meritless proceedings have been brought that one party is conducting a campaign of attrition against the other; meanwhile the other party incurs substantial attorney fees. At the same time, the family law courts may postpone consideration of sanctions for meritless

[14]We understand there may be a reluctance on the part of family law judges to entertain sanction hearings within such time frames on the ground that all attorney fee issues will be eventually resolved when the case comes to trial. This reluctance, however, allows parties to family law actions to be worn down before they ever get to trial, and permits judgment-proof parties to abuse the family law system.

[15]See, e.g., rule 706 (I) of the currently effective Rules of the Superior Court of Orange County, which contemplates that OSC's estimated to exceed 30 minutes will be transferred to the courtroom of the supervising judge of the family law panel for assignment as courtrooms become available.

proceedings until some distant final hearing, where the issue may take a backseat to other issues.[16] Single-judge assignments offer an effective family law remedy to the difficult problem posed by this case. And because single-judge assignments represent a remedy *within* the family law system, we see no reason to relax the traditional limits on malicious prosecution by extending that tort to cover family law cases. (See *Sheldon Appel, supra*, 47 Cal.3d at p. 874.) The trial judge correctly dismissed the cause of action for malicious prosecution.

V

■ We now must consider the balance of husband's causes of action. In addition to malicious prosecution he has alleged intentional infliction of emotional distress, negligent infliction of emotional distress, abuse of process, and conspiracy.

■ Conduct to support an intentional infliction cause of action must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Cervantez* v. *J.C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975].) Obviously, there must be something more than just facts supporting a malicious prosecution action; we may accept as a matter of course that being sued (or, as here, having to fend off a series of meritless applications and OSC's) gives rise to severe emotional distress. ■ This case, however, does not involve any action *outside of ordinary court proceedings* (see Civ. Code, § 47) calculated to humiliate or inflict emotional distress. Accordingly, we conclude that the judgment should be sustained on this cause of action.

Nor can, a fortiori, the negligent infliction of emotional distress cause of action survive. ■ Negligent infliction of emotional distress is not a cause of action in its own right, but a recognition that damages for emotional distress may be recovered in a negligence action. (*Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 884 [2 Cal.Rptr.2d 79, 820 P.2d 181] ["Negligent infliction of emotional distress is not an independent tort. . . ."]; see also 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 838, p. 195 [". . . the *negligent* causing of emotional distress is not an independent tort but the tort of *negligence*, involving the usual duty and causation issues."].) ■ This case contains no basis for a negligence cause of action, or any claim for emotional distress damages based on that negligence.

---

[16]Indeed, this appears to have happened in the case before us. At oral argument we were advised that the family law court had yet to rule on husband's requests for attorney fees for the various applications and OSC's brought against him.

■ Abuse of process is not just another name for malicious prosecution. Simply filing or maintaining a lawsuit for an improper purpose (such as might support a malicious prosecution cause of action) is not abuse of process. (*Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1169 [232 Cal.Rptr. 567, 728 P.2d 1202].)

Malicious prosecution and abuse of process are distinct. The former concerns a meritless lawsuit (and all the damage it inflicted). The latter concerns the misuse of the *tools* the law affords litigants once they are in a lawsuit (regardless of whether there was probable cause to commence that lawsuit in the first place). Hence, abuse of process claims typically arise for improper or excessive attachments (e.g., *White Lighting Co.* v. *Wolfson* (1968) 68 Cal.2d 336 [66 Cal.Rptr. 697, 438 P.2d 345] [loss of use of car by salesperson]) or improper use of discovery (e.g., *Younger* v. *Solomon* (1974) 38 Cal.App.3d 289 [113 Cal.Rptr. 113] [interrogatory in civil case really aimed at proving charge of ambulance chasing made in state bar proceedings]). ■ Here, there are no allegations of misuse of the tools of litigation otherwise available in the "regular conduct" of court proceedings (see *Templeton Feed & Grain* v. *Ralston Purina Co.* (1968) 69 Cal.2d 461, 466 [72 Cal.Rptr. 344, 446 P.2d 152]). Rather, the complaint here alleges that it is the *fact* of the multiple child custody proceedings themselves which wife, her mother and their attorneys used to oppress husband.

Finally, there is the conspiracy cause of action, directed at the wife's mother. This action fails because, as discussed above, the underlying tort of malicious prosecution fails.

## VI

The judgment of dismissal is affirmed. In the interests of justice each party will bear its own costs on appeal.

Wallin, J., concurred.

**CROSBY, J.,** Concurring and Dissenting.—As pleaded, this *is* an egregious case; my colleagues recognize that. But with today's companion decision affirming the domestic relations court (with which I am compelled to agree), the curious result is that there is no remedy in either that court *or* the civil law court against the person bankrolling the frivolous custody litigation, Blossom Rosen. This is contrary to the maxim that there is a remedy for every wrong (Civ. Code, § 3523) and, I think, simply incorrect. The civil action lies.

Taking the complaint as a whole, plaintiff has stated a cause of action for common barratry. It is of no moment that no present cause of action is so

yclept; a demurrer looks to the ultimate facts alleged without concern for labels. Civil pleading is not a torts examination, and the majority should not flunk plaintiff merely because his attorneys did not correctly title the wrong they pleaded ("A rose by any other name . . .").[1]

Also, the rule is that plaintiff's factual allegations must be presumed true and liberally construed upon review of a demurrer sustained without leave to amend. My colleagues do the opposite in considering the case against Blossom Rosen when, at a minimum, we should reverse to allow plaintiff to amend to specifically allege barratry.

Penal Code section 158 provides, "Common barratry is the practice of exciting groundless judicial proceedings . . . ." The misdemeanor is rarely prosecuted (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1190 [17 Cal.Rptr.2d 828, 847 P.2d 1044]), but it has happened. (See *People* v. *Sanford* (1988) 202 Cal.App.3d Supp. 1 [249 Cal.Rptr. 279.]) In *Rubin* the Supreme Court recently noted that the unlawful solicitation of litigation by attorneys is a modern descendant of barratry, a crime recognized in the common law. (*Rubin* v. *Green, supra*, at p. 1190.) That is not quite the same as saying the ancestor is dead, though, and it is a backhanded recognition of the historical existence of the tort in this state's jurisprudence.

*Rubin* is of further interest because the Supreme Court found the attorney solicitation branch of the barratry family tree should not flower with the fruit of malicious prosecution actions against lawyers by third parties. Would the same conclusion pertain here? I think not. There was a plethora of other potential remedies in *Rubin*: "[G]iven the regulatory and prosecutorial sanctions available to remedy attorney solicitation, together with those available to litigants within the scope of the predicate action itself, the utility of a proceeding such as this one is marginal." (4 Cal.4th at p. 1198.) By contrast, today's opinions deny *any* present remedy against Blossom Rosen for having wilfully cultivated vexatious litigation.[2]

Another concern of the *Rubin* court was the Malthusian multiplication of litigation via malicious prosecution actions: "A continuation of this action

[1]My colleagues' refusal to consider whether plaintiff has pleaded a cause of action for barratry may leave him free to file another suit on that ground, or perhaps not. That is a question for another day, and it will surely come. Justice and judicial economy cry out for us to deal with the question now. This dispute—or some aspect of it, domestic or civil—returns to our monthly docket with the grinding regularity of a recurring bad dream. For our sake, as well as the superior court's OSC departments, we should act to staunch this litigation now. If not, fille et mére have a license to abuse the system indefinitely.

[2]Assuming there is anything to the allegations in the complaint, Rosen could be prosecuted. But, while attorneys soliciting via "cappers" and "runners" often do draw vigorous prosecution, I know of no case in which a former in-law has been charged with maintaining frivolous and vexatious domestic relations litigation. And the district attorney would probably conclude

itself would add yet another layer of litigation. And that will not be the end of it." (4 Cal.4th at p. 1199.) Should the malicious prosecution action fail, the remedy will be "nothing less than another malicious prosecution action, this one against the plaintiff by defendants." (*Ibid.*) Is that a problem here? Hardly.

Few parents have the time, money, and desire to assist their children in successive malicious proceedings against former spouses. And the law carries its own protection: "No person can be convicted of common barratry except upon proof that he has excited suits or proceedings at law in at least three instances, and with a corrupt or malicious intent to vex and annoy." (Pen. Code, § 159.) This combination of intent and circumstance will, thankfully, not appear with any frequency in garden-variety domestic cases.[3] For example, parents assisting with legal expenses in routine dissolutions would rarely be subject to suit because they could not be shown to entertain the requisite vexatious intent nor would they often be willing to finance the same or similar misbegotten proceeding three or more times. But, as pleaded, this case is the exception, not the rule. There is no reason plaintiff should not be permitted to proceed against the allegedly wicked former mother-in-law on a cause of action in common barratry.

In the main, I agree with my colleagues' analysis and conclusions with respect to the other defendants. But I would reverse as to Blossom Rosen.

A petition for a rehearing was denied October 28, 1993. Crosby, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied December 30, 1993.

---

the courts can easily deal with rare cases of that ilk. If today's decisions are the best we can do, that determination might not be warranted.

[3]While barratry has received little mention in California civil cases (*Rubin* v. *Green, supra,* 4 Cal.4th 1187 is one; for another rare example see *Lucas* v. *Pico* (1880) 55 Cal. 126, 128), the elements of the complementary tort would presumably mirror those of the crime.